(26 Misc. Rep. 601.)

## ST. MICHAEL'S PROTESTANT EPISCOPAL CHURCH IN CITY OF NEW YORK v. FORTY-SECOND ST., M. & ST. N. AVE. RY. CO.

## SOCIETY FOR RELIEF OF DESTITUTE BLIND OF CITY OF NEW YORK AND ITS VICINITY v. SAME.

(Supreme Court, Special Term, New York County.    March, 1899.)

1. STREET RAILROADS—CHANGE OF MOTIVE POWER—INFERENCE.

A horse railroad consists of two tracks laid on opposite sides of the two tracks of an underground trolley system occupying the middle of a street 60 feet wide between the curbs, and there is 32 feet between the two outside rails of the horse railroad. A change of its motive power to the underground trolley system contemplates that the cars will project over the rails so that there will be less than 12 feet of clear space between them and the curb, but the rails are to be laid flush with the surface and the cars are to be run intermittently. *Held*, that it could not necessarily be inferred that the change would permanently obstruct it, and result in an exclusive appropriation of a portion of it to other than customary street uses, and that it would depend on the speed and frequency with which cars were run.

2. SAME—RIGHT TO CHANGE AT WILL.

Laws 1873, c. 825, granting the right to construct, operate, and maintain a street railroad by steam, animal, or mechanical power over certain streets and avenues in New York City, including what is now Amsterdam avenue, does not empower owners of the franchise to change at will the motive power of a constructed road, irrespective of the consent of the railroad commissioners or property owners.

8. SAME—CONSENT OF PROPERTY OWNERS.

Laws 1890, c. 565, § 100, providing that a street surface railroad may change its motive power on the consent of "the owners of one-half of the property bounded on that portion of the railroad with respect to which a change of motive power is proposed," contemplates that a majority of those owning property, measured by its extent in lineal feet along the route as to which a change of power is proposed, shall consent.

Actions by St. Michael's Protestant Episcopal Church in the City of New York and the Society for the Relief of the Destitute Blind of the City of New York and Its Vicinity, respectively, against the Forty-Second Street, Manhattanville & St. Nicholas Avenue Railway Company. Plaintiff in each case moves for an injunction pendente lite. Granted.

John Alex. Beall (Simon Sterne, John C. Coleman, John McDonald, and John M. Gitterman, of counsel), for plaintiff St. Michael's Protestant Episcopal Church in City of New York.

Howland & Murray (Henry E. Howland, of counsel), for plaintiff Society for Relief of Destitute Blind of City of New York and Its Vicinity.

Hoadly, Lauterbach & Johnson (Edward Lauterbach, William C. Trull, F. R. Minrath, and B. F. De Frece, of counsel), for defendant.

SCOTT, J. These are motions for injunctions pendente lite restraining the defendant from prosecuting the work of reconstructing its tracks so as to allow use of an underground electric trolley for the propulsion of its cars along Amsterdam avenue, in the city of New York. The defendant is a street-railway company organized under the general railroad law of 1850. It claims the right to

operate a railroad over the streets and avenues occupied by it under an assignment from Isaac M. Walton and others, to whom had been made a legislative grant of the right to construct, operate, and maintain a street railroad over certain streets and avenues, including what is now Amsterdam avenue. Laws 1873, c. 825. It was not until 1891 that the defendant constructed its tracks upon this avenue, the construction then being such as was adapted to the purposes of a horse railroad. In the meantime, and in the year 1883, another railroad corporation had constructed a horse railway through that portion of Amsterdam avenue between Seventy-First and Manhattan streets, and has since changed the construction of its roadbed so that it is now using the underground electric trolley system. This latter corporation, being the first to construct a line upon this portion of Amsterdam avenue, placed its two sets of tracks in the center of the avenue. Consequently, when the defendant came to build its tracks it was obliged to and did (between Seventy-First and Manhattan streets) place one set of tracks on either side of the avenue between the curb and the rails of the other company which had been already laid. Amsterdam avenue is 60 feet in width between the curbs, and the distance between the two outside rails of the four sets of tracks in the avenue is 32 feet 10 inches. The cars intended to be used by the defendant will project over the rails to such an extent that there will be less than 12 feet of clear space between the cars and the curb on either side.

The plaintiff in each of the above-entitled actions is the owner of valuable property fronting on Amsterdam avenue, and has never consented either to the construction of defendant's railway in the first instance or the change of the motive power. That these plaintiffs, as well as other property owners upon the avenue, will suffer substantial damage and inconvenience, other than that suffered by the public generally, in consequence of the proposed change in the motive power of defendant's road, is established by the affidavits read on the motion. Amsterdam avenue, which constitutes a part of what was formerly known as "Tenth Avenue," is owned by the city of New York, the abutting owners having no title thereto or interest therein, except such as is common to all the people of the state, and except, also, the easements appurtenant to their property arising out of the fact that it does abut upon a public street.

The defendant rests its right to change its motive power upon the claim that it has received consents from the requisite proportion of property owners, and from the board of state railroad commissioners, and has received the necessary permits to open the street from the designated officials of the city of New York; and it further claims that under the grant of 1873, which is the basis of all its rights, it is authorized and empowered to change its motive power at will, irrespective of any consent either from the railroad commissioners or the property owners. The plaintiffs insist that the operation of the defendant's road, at least between Seventy-First and Manhattan streets, by an underground electric trolley, will inevitably interfere with, and to a certain extent destroy, their easement of access to their property, and that, inasmuch as such

easement is part of their property, it cannot be destroyed or impaired until the right to do so has been acquired either by express grant or by proceedings in invitum.   The question here suggested has been much discussed in this state, and the test to be applied in each case appears to be whether or not the proposed use of the street will permanently obstruct it, and result in a total and exclusive appropriation of a portion of it to other than customary street uses.   So far as appears at present, the proposed change of motive power by the defendant will not necessarily so result.   The rails are to be laid flush with the surface, and the cars are to be run intermittently.   The reasoning of our courts in cases involving the use of streets by railroad companies, and certain expressions to be found in some of the adjudicated cases, give warrant to the proposition that, to deprive an abutting owner of the right to consequential damages, the use of a street by a railroad, even when operated upon the surface, must be reasonable, and not such as to substantially prevent the use of the street for the usual street purposes; and the plaintiffs insist that, while two sets of tracks may not involve such an appropriation of the street as to seriously interfere with its use for usual street purposes, the imposition of a third and fourth set of tracks must result in a practical appropriation of the street to railway purposes exclusively.   This may hereafter prove to be true, but at present can be merely a matter of conjecture.   Whether or not it will ever prove to be true will depend in great measure upon the speed and frequency with which the defendant, and the other railroad now occupying the street, may run their cars.   All that can with certainty be said at present is that the change of motive power, and the reconstruction of the road incident thereto, will not necessarily deprive the plaintiffs of any property right, or entitle them, as abutting owners, to consequential damages.

It remains to be considered whether or not the defendant has acquired a right to change its motive power, and incidentally to open the surface of the street, dig trenches therein, and erect the structure necessary for the use of the underground trolley system; for it is clear that the construction of the roadbed in the manner described in the affidavits read upon this motion would, if not warranted by express authority of law, constitute a nuisance, to prevent which an abutting owner may maintain an action.   The contention of the defendant that the original grant to Walton and his associates confers the right to change the motive power of the road at will is, in my opinion, untenable.   It does not differ substantially from a similar contention by the Third Avenue Railroad, which was decisively overruled by the court of appeals.   People ex rel. Third Ave. R. Co. v. Newton, 112 N. Y. 396, 19 N. E. 831. As was said by the same court in a later case, such a change of motive power implies that there has been conferred upon an existing railway company "a new or additional franchise, and authorizes it to impose upon the streets a greater or different burden."   In re Third Ave. R. Co.; 121 N. Y. 536, 541, 24 N. E. 951.   It is necessary, therefore, to find express legislative authority for the change

of motive power, and, having found it, to inquire whether the de-
fendant has complied with the statutory requirements. The au-
thority is found in section 100 of the railroad law (Laws 1890, c.
565), which provides as follows:

"Any street surface railroad may operate any portion of its road by ani-
mal or horse power, or by cable, electricity, or any other power than locomo-
tive steam power, which may be approved by the state board of railroad
commissioners, and consented to by the owners of one-half of the prop-
erty bounded on that portion of the railroad with respect to which a change
of motive power is proposed; and if the consent of such property owners
cannot be obtained, the determination of three disinterested commissioners,
appointed by the general term of the supreme court of the department in
which such railroad is located, in favor of such motive power, confirmed by
the court, shall be taken in lieu of the consent of the property owners.
The consent of the property owners shall be obtained and the proceedings
for the appointment and the determination of the commissioners and the con-
firmation of their report shall be conducted in the manner prescribed in sec-
tions ninety-one and ninety-four of this article, so far as the same can be
made applicable thereto."

It is not disputed that the defendant has received the approval
from the state board of railroad commissioners, but whether it has
obtained the consent of the requisite number of property owners is
sharply contested. It becomes important, in the first place, to de-
termine by what property owners the consent must be given. The
first statutory authority for a change of motive power by a street
railway company is found in section 12, c. 252, Laws 1884, which
provided for the use of any motive power (other than locomotive steam
power) which might be consented to by the local authorities, and by
a majority of the property owners, obtained in accordance with sec-
tions 3 and 4 of the act; the property owners referred to in section
3 being the owners of one-half in value of the abutting property on
each street or avenue. In 1889, after the local authorities of the city
had objected to the increased burden sought to be imposed upon the
streets, without increased compensation, by a railway seeking to
change from horse to cable power, and their objection had been sus-
tained by the court of appeals, section 12 of the act of 1884 was
amended by substituting the railroad commissioners for the local
authorities, and by inserting a requirement for the consent of the
owners of one-half in value of the property bounded on that portion
of the railroad as to which a change of motive power is proposed.
Laws 1889, c. 531. The railroad law of 1890 again amended the provi-
sion by omitting the words "in value," and, as thus amended, the sec-
tion remains in force at the present day. Laws 1890, c. 565, § 100;
Laws 1892, c. 676. The defendant strenuously contends that the omis-
sion of the words "in value" by the acts of 1890 and 1892 is significant
and important, and cannot be disregarded, and that the owners whose
consent is requisite are not a majority of those owning property
measured by its value, but a majority of those owning property meas-
ured by its extent in lineal feet along the route as to which a change
of motive power is proposed. With this contention I am disposed
to agree. It will be observed, from a comparison of the statutes, that
by the act of 1884 it was necessary to procure the consent of a major-
ity of the owners on each street or avenue comprising the route as

to which a change of motive power was proposed. The language of the present act is different from that employed in the act of 1884. It requires the consent of a majority of the property owners "on that portion of the railroad as to which a change of motive power is proposed." It is obvious that this provision contemplates the possibility that a railroad may not desire to change its motive power as to its whole route, but may propose to do so only as to a certain portion or portions thereof, and the act authorizes such partial change. The defendant's railroad is not a single continuous line, but consists of a number of lines or routes, passing through a great number of streets and avenues, having four or five separate or noncontinuous routes running approximately north and south, and a like number running approximately east and west. In its application to the railroad commissioners for leave to change its motive power, the defendant seems to have provided for taking advantage of the provision of the railroad law authorizing a change as to a portion only of the entire route of a railroad. The application, as recited in the certificate of approval by the railroad commissioners, was for a change of motive power "upon the whole or sections of the applicant's railroad, upon the following streets and avenues, to-wit." Then follows a description of the several segregated sections of the entire route as to which approval was asked, each section being described in such manner as to be complete in itself, and being separated from the description of the preceding and succeeding sections by a colon and the word "also." The approval of the railroad commissioners was given in terms in accordance with the application, so that the defendant has the right, so far as the railroad commissioners can give it, to change its motive power at will upon any one or any number of the sections of its route it may choose. It is not necessary, so far as this motion is concerned, to consider whether or not the change of phraseology adopted by the railroad law has changed the rule which obtained, under the act of 1884, that the consent must be that of a majority of owners on each street comprising the route. Certainly, under such a certificate of approval as the defendant obtained from the railroad commissioners, the statute would not be satisfied, as to any section of the whole route, by the consent of a mere majority of property owners on all the sections taken together; for in that case the consent of the property owners along sections as to which it was not presently intended to change the motive power might easily outweigh the nonconsents of all the property owners along a section upon which a change of motive power was imminent. Having elected to apply for and obtain the approval of the railroad commissioners to a change of motive power not as to the entire route as a whole, but as to segregated and distinct sections of the route, the defendant cannot lawfully proceed to change its motive power as to any one of these sections until and unless it shall have obtained, at the very least, the consent of the owners of one-half the property bounded upon the particular section as to which a change of motive power is proposed to be effected. One of the sections is described in the application to the railroad commissioners as follows: "From Manhattan street, through, along, and upon Tenth avenue, to Forty-Second street,"—which includes that portion

of Tenth avenue now known as "Amsterdam Avenue." It follows from what has been said that, before the defendant can lawfully proceed to dig up and interfere with the street for the purpose of changing its motive power on Tenth or Amsterdam avenue, it must have obtained the consents of the owners of one-half of the property, measured by lineal feet, abutting upon said avenue from Manhattan street to Forty-Second street. The defendant claims to have obtained such consents, and, as this claim is controverted by the plaintiffs, it must be examined.

The right to tear up the streets for the purpose of constructing or altering the construction of railroads therein is one which can be obtained only in pursuance of legislative authority, and, where the legislature has prescribed conditions precedent to the exercise of such a right, any company claiming to have acquired the right must be prepared, when called upon in a proper proceeding, to show that it has complied with the precedent conditions. When such a company produces consents apparently formal, regular, and sufficient, it has established prima facie the right to prosecute its change of motive power, and the burden then rests upon the party challenging such right to impeach such consents as he calls in question. When such consents are so impeached, however, on grounds apparently sound, it becomes necessary for the company to defend the impeached consents. The defendant in the present case presents a number of consents of property owners, which have been critically examined by the plaintiffs, who present affidavits specifying those whose sufficiency they impeach, giving in each instance the ground of impeachment. They also submit, under oath, an apparently carefully prepared series of computations, which, if accurate, seem to demonstrate that the requisite consents have not been obtained. It appears that the total number of lineal feet on both sides of the avenue, from Forty-Second street to Manhattan street, is 33,794 $^{11}$/12, so that, under the construction of the railroad law insisted on by the defendant, it must have the consent of the owners of 16,897 $^{6}$/12 lineal feet. It professes to have received, and has submitted for examination by the plaintiffs, consents purporting to represent 18,415 $^{8}$/12 lineal feet, showing an apparent surplus of consents in favor of a change of motive power of 1,518 $^{2}$/12 lineal feet. It appears, however, that many of these consents do not comply with the statute, and are, for one reason or another, void and of no effect. In some cases, the consents are conditioned upon their being but one set of tracks on the avenue; in others, the consents are signed by persons who, at the dates of the execution thereof, were not the owners of record of the property referred to therein; in others, the persons signing were merely part owners of the property, either as joint tenants or tenants in common; in others, the consents were signed by a single member of a firm, in the firm name, although the record title stood in certain members of the firm as individuals; in others, the consents were signed by persons claiming to act as attorneys in fact for the owners, although no power of attorney was produced authorizing such signature; in others, the consents were signed by executors of estates, under wills apparently conferring no authority to sign such consents; and

in yet other cases, various apparently sufficient reasons appear for impeaching the consents. In all, the plaintiffs specify consents representing 4,526 $6/12$ lineal feet which they allege to be invalid, and as to each of which they point out the ground of objection. If all of the consents thus impeached are to be thrown out, instead of having a surplus of 1,518 $2/12$ lineal feet, the defendant would be confronted with a deficiency of 3,008 $4/12$ lineal feet. The affidavit containing the foregoing specifications of invalidity was served upon defendant's attorneys, and full opportunity given to reply. As to a number of the impeached consents, reasons are suggested why they should be held to be valid. Some of these reasons commend themselves to my judgment; many of them do not. So far as concerns consents executed by attorneys in fact, or by executors of wills, it is impossible to determine their validity without an examination of each instrument alleged to have conferred authority to sign. The statute requires the consent of the owners of the property, and, while any owner can undoubtedly consent through an attorney in fact, there is no presumption that a power to sell, whether contained in a power of attorney or will or trust deed, implies and includes the power to give a statutory consent. The proposition cannot be controverted that a naked power to sell confers upon the holder of the power no title to, or interest in, the property which is the subject of the power. Nor can a consent signed by the holder of a naked power of sale be justified upon the theory that giving the consent involves the conveyance or release of some part of the estate of the abutting owner; for such a contention could be supported only upon the further theory that the change of motive power operated to deprive each abutting owner of some part of his estate, and, if this were true, the change could not be made at all until so much of the estate as the change of motive power would take from every abutting owner had been acquired by grant or condemnation. Hence it is not a sufficient defense of an impeached consent to say that the person signing it held a power of sale, without stating the terms and scope of such power. Where it appears that the person signing the consent is not the owner of record of the property, it is not a satisfactory defense of the impeached consent to suggest that "the persons named in the first column may have made deeds to the persons named in the second column which were not recorded." Where a consent is signed by an alleged attorney in fact, whose power of attorney is not produced, its place is not supplied by the allegation that "deponent believes that the signer is a reputable and honorable individual, and that his signature as attorney for those for whom he purports to act was authorized by them." Similar trivial and unconvincing explanations are offered as to a considerable number of the impeached consents. It is not necessary to state in detail the results of a critical examination of the explanations offered, because, if every consent impeached by the plaintiffs as to which a defense or explanation is offered by the defendant should be held to be valid and effectual, the defendant would still lack the requisite number of consents by 1,204 $1/12$ lineal feet, and, if all the suggested defenses of the impeached consents were examined and passed upon in detail, the deficiency would be much greater. I have

not overlooked the fact that an affiant on the part of the defendant swears that consents have been received from the owners of property on Tenth avenue, from Forty-Second street to Manhattan street, representing a surplus over one-half of 2,274 $^5/_6$ lineal feet. This is, however, a mere dogmatic assertion of his conclusion, without the statement of a single evidentiary fact to support it, and is not to be considered in opposition to the detailed statements contained in the affidavits submitted by the plaintiffs. Even if it were to be considered, however, the result would remain substantially unchanged. It is evident that in computing this alleged excess the defendant has counted as valid all of the consents, representing 4,526 $^6/_{12}$ lineal feet, impeached by the plaintiffs, except those of a half dozen persons mentioned in the affidavit, which do not represent in the aggregate over 400 lineal feet, at the very outside. Of the impeached consents, no explanation whatever is offered as to those representing 2,722 $^3/_{12}$ lineal feet. Deducting from this number the consents representing not more than 400 feet, possibly excluded by the defendant in estimating its surplus, leaves consents representing 2,322 $^3/_{12}$ feet which have been impeached and not defended as an offset to the claimed surplus of 2,274 $^5/_6$ feet, leaving a deficiency of 44 $^3/_{12}$ feet, which, as has already been said, could be largely increased if it were deemed necessary in this opinion to go into a critical and detailed examination of the defenses offered as to the impeached consents. I have not deemed it necessary to examine the evidence as to the sufficiency of the consents upon the basis of the ratio of the value of the property represented thereby to the value of all the property on the avenue, nor do I express any opinion upon the question raised and urged with much force, as to whether or not the defendant has any right to be upon the avenue at all. As the case stands, upon the evidence produced on this motion, it seems clear that the defendant has not acquired the right to change its motive power, and the motions for an injunction pendente lite must therefore be granted, with $10 costs in each case.

Motions granted, with $10 costs in each case.